IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 19, 2012

**STATE OF TENNESSEE v. DAVID JOSEPH BUCKHANON**

**Appeal from the Circuit Court for Maury County**
**No. 19371    Robert L. Holloway, Judge**

_____

**No.  M2011-00619-CCA-R3-CD - Filed November 28, 2012**

_____

Appellant, David Joseph Buckhanon, was convicted by a Maury County jury of facilitation of attempted first degree murder, facilitation of especially aggravated burglary, and facilitation of especially aggravated robbery.  As a result, Appellant was sentenced to an effective sentence of twenty three years.  After the denial of a motion for new trial, Appellant initiated this appeal.  He challenges: (1) the trial court's exclusion of testimony by a witness who heard the Appellant's co-defendant state that he, rather than Appellant, was responsible for the shooting; (2) the trial court's admission of Appellant's alleged street name "Laylow"; (3) the trial court's admission of testimony from a detective that there was no evidence of a third participant in the shooting; (4) the insufficiency of the evidence; and (5) the application of enhancement factors to his sentence.  After a review of the evidence, we determine: (1) the trial court properly excluded hearsay testimony; (2) the trial court properly admitted evidence of Appellant's street name; (3) the trial court properly excluded evidence of Appellant's claim of a second accomplice where there was no corroboration; (4) the evidence was sufficient to support the convictions; and (5) the trial court properly sentenced Appellant.  Consequently, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court is Affirmed**

DONALD P. HARRIS, SP. J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Hershell D. Koger, Pulaski, Tennessee, for the appellant, David Joseph Buckhanan.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; T. Michael Bottoms, District Attorney General; and Daniel J. Runde, Assistant District Attorney General, for the appellant, State of Tennessee.

## OPINION

### *Factual Background*

On September 28, 2009, Thomas Edward Jones, the victim, also known as "Peanut," was living in an apartment at 1117A Comstock Avenue in Columbia, Tennessee with his girlfriend, Chastity Price. Sarah Williams, who actually leased the apartment, also lived there. Ms. Williams described herself and Ms. Price as prostitutes and their apartment as a "trap house," a place where people could come and go, doing "whatever they wanted to do, whenever they wanted to do it."

It was football season and a number of friends had come to the apartment to watch Monday Night Football, including Appellant, whom the victim knew as "Laylow,"[1] and Appellant's friends, Antonio Warfield, known as "K-Sneaky," and Demontrae Smith, known as "Pisspot." The guests, including the victim, were drinking and doing drugs throughout the evening. The victim had been drinking "new gin" and had ingested marijuana and Xanax during the course of the evening.

At some point, Ms. Williams and Ms. Price left the apartment and returned later that evening. When Ms. Williams went inside, she thought she saw vomit on the floor. Ms. Williams yelled for the victim, but he did not answer. Ms. Williams walked farther into the apartment. When she got to the bathroom, she saw blood on the floor and feet hanging out of the bathtub. Ms. Williams exited the apartment and called authorities.

Around 2:00 a.m., the police were dispatched to the residence. When Officers Brian Stoker and Keith Fall arrived, they found a spent twelve-gauge shotgun casing and a large quantity of blood. The officers finally located the victim sitting on a bed in one of the bedrooms. He was missing the lower half of his face. The officers saw teeth on the bed and floor. When the officers entered the bedroom, the victim stood up and tried to approach the officers. The victim was trying to talk, but officers described his speech as incoherent. The victim was taken almost immediately to the hospital.

On October 5, 2009, several days after the shooting, Detective Orlando Cox met with the victim in the hospital. By that time, the victim had a trachea tube inserted that allowed him to speak. He was able to provide street names and descriptions of the perpetrators. He described Appellant's hairstyle as "dreads." From this information, the police developed Appellant as a suspect.

---

[1] In the transcript, Appellant's nickname is spelled "Laylo" and "Laylow." We have chosen to utilize the spelling "Laylow" for the sake of consistency.

Joey Gideon, a detective sergeant with the Columbia Police Department, was involved in the investigation of the shooting. When, on October 5, 2009, the investigation began to focus on the Appellant and Antonio Warfield, he telephoned the number that was listed for the Appellant. A male answered. Detective Gideon identified himself and asked to speak to "Mr. Buckhanon." The male responded that he was not there. Suspecting he was talking to Appellant, Detective Gideon related that he needed for him to "come in and talk to me about this." The male responded that he had the wrong number and hung up.

Later, on October 22, 2009, after he was arrested on a warrant, Appellant was interviewed by Detective Gideon. Initially, he denied having any involvement in the offense or any knowledge about the crime. Appellant eventually admitted that he was involved but denied that he was the person who shot the victim. Appellant told Detective Gideon that he overheard Antonio Warfield and Christopher Davis, also known as "Fish," talking about Peanut (the victim). Warfield inquired if he had anything to rob. Davis told him that the victim had "weed and money." Warfield told the Appellant that he was going over there and that "Peanut had pulled a gun on him before." Appellant claimed that he drove Warfield and another "dude" to the scene of the crime and drove them away after they shot the victim. Appellant claimed during his interview that he did not know that they intended to shoot the victim.

In December 2009, Appellant was indicted by the Maury County Grand Jury for attempted first degree murder, especially aggravated burglary, and especially aggravated robbery. The case was tried before a jury on January 4 through 7, 2011.

At trial, the victim testified that Appellant, known to him as "Laylow" and described as having dreads, Warfield, and Demontrae Smith were at the apartment that night watching football. After Ms. Price and Ms. Williams left at some point during the evening, the victim went to his room to lie down. He took off his shorts and placed them in the floor. In the pocket of his shorts, the victim had about one hundred dollars in cash, some marijuana, and some Xanax pills. The victim dozed off. When he awoke, he saw Appellant and Warfield entering his bedroom. The victim tried to grab his phone to call someone. Appellant asked for money. The victim reached for his shorts and there was a "big explosion."

The victim's next memory was being in the bathroom "trying to rub [his] skin back onto [his] face." The victim lost consciousness. When he awoke this time, he was in the bathtub and Warfield was holding his legs. According to the victim, Appellant shot him again in the face. The victim's next memory was waking up in the hospital. As a result of his injuries, the victim was permanently blind.

Appellant presented the testimony of Cassandra Southall, a former roommate and convicted felon. Ms. Southall dated Demontrae Smith. She claimed that she had never heard anyone refer to Appellant as "Laylow" prior to the shooting but had heard people refer to Appellant with that name since the incident. She described Appellant's hairstyle as "twists" rather than "dreads." Ms. Southall also testified that she had seen the victim pull a gun on Warfield prior to the incident.

Demontrae Smith, also known as "Pisspot," testified that he was not at the victim's home the night of the shooting. He admitted that he frequented the residence and knew others who were often present there. He testified that he had met Appellant a couple of times before the shooting occurred but knew him only as "Laylow. Smith had heard others in the group who frequented the 1117 Comstock Avenue residence refer to Appellant as Laylow.

Amanda Thompson testified that on the night of the shooting she, Appellant, and Christopher Davis went to the Comstock Avenue apartment leased by Sarah Williams. Only Jones was there. They left the apartment and went to Christopher Davis' place in the Woodland trailer park. While there, Antonio Warfield asked if he could borrow Ms. Thompson's car. She gave him the keys. She also saw Appellant at Davis's residence.

Ms. Thompson also testified that Appellant went by the street name "Laylow." She testified that she, herself, had given him the name during the months prior to the shooting.

Appellant testified at trial. His testimony, for the most part, recapped the information that he had given to the police. Appellant testified that he, along with Amanda Thompson and Christopher Davis had been to the Comstock Avenue apartment earlier during the evening of September 28, 2009. He stated that the victim was smoking meth and had some crack cocaine. According to the Appellant, Davis had once had a relationship with Chastity Price and did not like that she was now with the victim. Davis and the victim began "slick assing some words." After being there for 15 or 20 minutes, he, Amanda and Christopher Davis left and went to the Woodland trailer park where Davis lived. There they met up with Antonio Warfield. Davis was still upset with the victim. Warfield asked who he was talking about, and Davis revealed that it was Mr. Jones. Warfield related that Jones had once pulled a pistol on him and inquired as to whether he had anything. Davis told him something, and Warfield got "hyped up . . . about robbing him." Later, according to Appellant, Warfield asked Appellant to drive him to the store. While en route, Warfield was talking to someone on his phone. At Warfield's direction, they picked up a third individual who had long rifles wrapped in a sheet. Appellant testified they were not shotguns. According to Appellant, Warfield directed him to a location where Warfield and the third individual got out with the weapons. Later, Warfield phoned again and asked Appellant to return and pick him up. He did so and testified that he did not know there was a shooting until the next day. Appellant

-4-

denied any involvement in the shooting. He also denied having "dreads" in his hair at the time of the offense but admitted that his hair was in a style referred to as "twists." He admitted that he was called "Laylow" by Amanda Thompson.

At the conclusion of the proof, the jury convicted Appellant of the lesser included offenses of facilitation of attempted first degree murder, facilitation of especially aggravated robbery, and facilitation of especially aggravated burglary.

The trial court held a separate sentencing hearing. At the hearing, the victim testified about the extent of his injuries. The trial court heard proof from the Board of Probation and Parole that Appellant was on probation for attempted aggravated robbery at the time of the offenses. Appellant also had prior convictions for driving on a suspended license and possession of stolen property.

Detective Gideon testified that Appellant made a phone call while in incarceration prior to trial to the witness, Sarah Williams. During that conversation, Appellant instructed Ms. Williams to testify that his nickname was not "Laylow" and that his hair was not in "dreads" at the time of the offenses.

Appellant's mother testified as to Appellant's troubled youth and abusive father. She described Appellant as a "helpful" child who had a lot of "potential."

At the conclusion of the sentencing hearing, the trial court applied several enhancement factors, ultimately sentencing Appellant to twelve years for facilitation of attempted first degree murder, three years for facilitation of especially aggravated burglary, and eight years for facilitation of especially aggravated robbery. The sentences were ordered to be served consecutively, for a total effective sentence of twenty-three years.

Appellant filed a timely motion for new trial. The trial court denied the motion. Appellant filed a timely notice of appeal. On appeal, he challenges the sufficiency of the evidence, his sentence, and several evidentiary issues.

*Analysis*

*Hearsay Statements*
*A. Statement That Someone Else Admitted to Committing Offenses*

Appellant first challenges the trial court's exclusion of testimony from Demontrae Smith. Specifically, Appellant argues that the trial court should have allowed Smith to testify that he overhead Antonio Warfield say that he shot the victim in order to gain status in a

gang. The State insists that this testimony was hearsay that did not meet any exception to the hearsay rule, and, therefore, the trial court properly excluded the testimony.

The Tennessee Rules of Evidence prohibit the introduction of hearsay, which is any statement, other than one made by the declarant at trial or at a hearing, offered to prove the truth of the matter asserted. Tenn. R. Evid. 801(c), 802. Hearsay is nevertheless admissible if it falls within one of the exceptions provided by the Rules. In *State v. Gilley*, 297 S.W.3d 739, 759-60 (Tenn. Crim. App. 2008), this Court held that a de novo standard of review applies to our review of hearsay issues.

In rare circumstances, a defendant's constitutional right to present a defense can essentially trump the rule against hearsay. *State v. Brown*, 29 S.W.3d 427, 433-34 (Tenn. 2000) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298-301 (1973)). Our state supreme court has adopted the reasoning in *Chambers*, stating:

> The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important.

*Brown*, 29 S.W.3d at 433-34 (citing *Chambers*, 410 U.S. at 298-301). This Court must consider and balance the principles of relevance and hearsay under the Tennessee Rules of Evidence with the rights of the accused to confront and cross-examine witnesses and to call witnesses in his defense when determining whether the evidence is admissible.

At trial, counsel for Appellant asked for a jury-out hearing prior to the testimony of Demontrae Smith. During the jury-out hearing, Mr. Smith claimed that while at the police station pending arrest, Antonio Warfield, or "K-Sneaky," told Mr. Smith that "he had done it . . . shot [the victim]." Counsel for the State objected on the basis of hearsay. Smith claimed that Warfield told him he shot the victim to "get his status" in a gang.

Counsel for Appellant admitted that the testimony of Mr. Smith was hearsay that did not meet any exception of the hearsay rules but argued that excluding the evidence would violate Appellant's right to present a defense and that, as an admission against interest, Mr. Warfield's statement was inherently reliable. In other words, the stated purpose for seeking to introduce the statement allegedly made by Warfield to Mr. Smith was to prove that the Appellant was not the perpetrator of the offense. He argues the evidence was critical to his theory of the defense, that he was not the shooter. Appellant points to inconsistencies in the

-6-

victim's testimony including the victim's claims: (1) that he saw Mr. Smith leaving the apartment as Appellant and Mr. Warfield were entering the residence; and (2) that he was shot in the bedroom and while lying in the bathtub, where there was evidence admitted to the contrary. According to Appellant, these inconsistencies in the victim's testimony bear heavily on the victim's "ability to accurately identify [Appellant] as the shooter," so the excluded evidence was crucial to his defense. Additionally, Appellant argues that Mr. Warfield's statement was actually admissible as a statement against interest and the only reason for excluding the evidence was the hearsay rule. However, the trial court examined the evidence and concluded that it did not bear sufficient indicia of reliability and did not fit within any recognized hearsay exception.

We agree. According to Detective Cox during a jury-out hearing, Warfield, in his statement to the police, identified Appellant as the shooter.[2] It seems to us that allowing Mr. Smith to testify concerning what Warfield had told him would open the door to allowing the differing versions of the incident given by Warfield. We agree with the trial court that the contradictory statements given by Warfield were evidence of a lack of the indicia of reliability required by Chambers and Brown. Appellant's assertion that the statement is admissible as a statement against interest is likewise misplaced. Rule 804 of the Tennessee Rules of evidence provides, in part, as follows:

> (b) Hearsay Exceptions. — The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> * * *
>
> (3) Statement Against Interest. — A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

In order for the statement to be admissible under this exception, there must be proof of the witness' unavailability. Here there was no effort by the Appellant to show Warfield's unavailability. He was not subpoenaed to testify and Appellant, through counsel, stated that

---

[2]Moreover, Assistant District Attorney Dan Runde represented to the court that Smith's statement about what Warfield had told him included an account that Warfield had placed Mr. Jones in the bathtub while Appellant searched the apartment. When he found nothing, Appellant told Warfield to hit the victim. Warfield did so and when he hit him a second time, the gun went off.

he would not attempt to subpoena him. Had Warfield been subpoenaed and asserted his Fifth Amendment privilege against self incrimination, he would have been considered unavailable and the statement would have been admissible as a statement against interest. Absent such a showing, the exception to the hearsay rule contained in Rule 804(b)(3) is not available. See, e.g. *State v. Cureton*, 38 S.W.3d 64, 79 (Tenn. Crim. App. 2000) app. denied (Tenn. Nov. 6, 2000).

Moreover, the evidence proffered by Appellant is not, in our opinion, critical to Appellant's defense. Appellant gave a statement to police in which he denied pulling the trigger and testified at trial that he was not responsible for the shooting. He claimed that his participation was limited to driving Mr. Warfield and another man to and from the victim's home. Finally, the court had a significant interest in not allowing the presentation of unreliable hearsay evidence to the jury that would open the door to other statements made by Warfield. This issue is without merit.

### B. Use of Appellant's Nickname

Next, Appellant claims that the trial court erred by admitting into evidence testimony that Appellant's nickname was "Laylow." Specifically, Appellant insists that the statement was inadmissible hearsay. The State disagrees.

Evidence is admissible if it is relevant. Tenn. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Again, the introduction of hearsay is prohibited unless it falls within one of the exceptions to the rules of evidence. Tenn. R. Evid. 801(c), 802, 803, 804.

In this case, the victim told police that someone named "Laylow" was responsible for shooting him in the face. The victim identified Appellant as "Laylow" at trial. Additionally, Amanda Thompson, Sarah Williams, Demontrae Smith, and Cassandra Southall all testified, without objection from Appellant, that Appellant's street name was "Laylow." Appellant, himself, admitted he was called "Laylow" by Ms. Thompson. According to testimony from Detective Cox about the investigation, Appellant was developed as a suspect by the use of his street name and description. Detective Cox testified that Appellant's street name was reputed to be "Laylow." In our view, this is closer to being reputation of personal history

which is not excluded by the hearsay rule. Rule 803(19), Tennessee Rules of Evidence.[3] Appellant is not entitled to relief on this issue.

## *C. Third Participant Allegation*

Lastly, Appellant argues that the trial court erred by allowing Detective Gideon to testify that he uncovered absolutely no evidence that there was a third person involved in the crime. Specifically, Appellant argues that this was a personal opinion and was improperly admitted.

Rule 701(a) of the Tennessee Rules of Evidence addresses the admissibility of opinion testimony offered by non-experts. The rule provides, in relevant part:

> (a) If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
>
> (1) rationally based on the perception of the witness; and
>
> (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Tenn. R. Evid. 701(a). The Rule was amended because, prior to 1996, it "precluded any lay opinion if the lay witness could substitute facts for opinion." Tenn. R. Evid. 701, Advisory Commission Comments (1996). Although the 1996 amendment eliminated certain restrictions on opinion testimony, it was not meant to eliminate the distinction between expert and lay testimony. *See* Tenn. R. Evid. 702-706; Neil P. Cohen et al., <u>Tennessee Law of Evidence</u> § 701.3 (3d ed. Supp. 1999). "The distinction between an expert and a non-expert witness is that a non-expert witness's testimony results from a process of reasoning familiar in everyday life and an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field." *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992).

---

[3] Rule 803. Hearsay exceptions. The following are not excluded by the hearsay rule:

> (19) Reputation Concerning Personal or Family History. — Reputation among members of a person's family by blood, adoption, or marriage or among associates or in the community concerning a person's birth, adoption, marriage, divorce, death, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history.

In this case, Detective Gideon stated that he did not encounter any evidence in his investigation to suggest that there was a third participant in the offense. Specifically he stated that there were "no leads, no information to work off, and . . . nothing in my investigation to believe that this person exists." Appellant objected. The trial court overruled the objection. We conclude that Detective Gideon's testimony was not contrary to Rule 701. The statements made about the failure to locate a third participant were rationally based on Detective Gideon's perception and helpful to the jury's evaluation of Appellant's credibility as a witness. Appellant is not entitled to relief on this issue.

### Sufficiency of the Evidence

Appellant argues that the evidence is not sufficient to support the convictions. Specifically, he argues that identification of the perpetrator was "abrogated" by the victim's blindness. Additionally, the improper introduction of Appellant's nickname "Laylow" bolstered the victim's testimony. In other words, Appellant argues that he was not properly identified as the perpetrator of the offenses.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court will not reweigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *see also Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of witnesses, the

weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000). Importantly, the credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact. *Bland*, 958 S.W.2d at 659.

When viewed in a light most favorable to the State, the evidence was sufficient to support the convictions. Appellant was actually identified by the victim as the person who committed the offenses, coming into his apartment while he was asleep, shooting the victim in the face, and taking his money from the pocket of his shorts. Appellant argues that the victim's subsequent blindness affected his ability to identify Appellant as the perpetrator. We disagree. The victim testified that he was able to see out of one eye even after he had been shot. After reviewing the evidence and assessing the credibility of the witnesses, the jury convicted Appellant of the lesser included offenses of facilitation of attempted first degree murder, facilitation of especially aggravated burglary, and facilitation of especially aggravated robbery. The evidence supports these convictions. Appellant is not entitled to relief on this issue.

Lastly, Appellant insists that the trial court erred in sentencing "with respect to the determination of applicable and inapplicable enhancing factors." Specifically, Appellant argues that the trial court inappropriately applied enhancement factor (5), that the victim was treated with "exceptional cruelty," in enhancing the conviction for facilitation of attempted first degree murder. *See* T.C.A. § 40-35-114(5). The State disagrees, arguing that the enhancement factor was properly applied. In the alternative, the State contends that the remaining enhancement factors were enough to justify enhancement of Appellant's sentence.

"When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of the issues. The review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d). "[T]he presumption of correctness 'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). "If . . . the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails." *Id.* at 345 (citing *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992)). We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination, a trial court, at the conclusion of the sentencing hearing, first determines the range of sentence and then determines the specific sentence and the appropriate combination of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts regarding sentences for similar offenses, (7) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995). When imposing the sentence within the appropriate sentencing range for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c). However, the weight given by the trial court to the mitigating and enhancement factors is left to the trial court's discretion and is not a basis for reversal by an appellate court of an imposed sentence. *Carter*, 254 S.W.3d at 345. "An appellate court is . . . bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id.* at 346.

"The amended statute no longer imposes a presumptive sentence." *Id*. at 343. As a result of the amendments to the Sentencing Act, our appellate review of the weighing of the enhancement and mitigating factors was deleted when the factors became advisory, as opposed to binding, upon the trial court's sentencing decision. *Id.* at 344. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and mitigating factors. *Id.* The trial court's weighing of various mitigating and enhancement factors is now left to the trial court's sound discretion. *Id.*

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *See id.* at 343; *State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects that "the trial court appl[ied] inappropriate mitigating and/or enhancement factors or otherwise fail[ed] to follow the Sentencing Act, the presumption of correctness fails" and our review is de novo. *Carter*, 254 S.W.3d at 345.

The trial court applied enhancement factor (5), that Appellant "treated, or allowed [the] victim to be treated, with exceptional cruelty during the commission of the offense." T.C.A. § 40-35-114(5). The trial court stated that he could not "think of anything much crueler than shooting someone at close range that's being held with a shotgun in the face." While enhancement factor (5) is more typically utilized in cases of abuse or torture, this Court has upheld the application of this enhancement factor where traumatic and severe

-13-

injuries are sustained by the victim. *State v. Gray*, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997); *State v. Holland*, 860 S.W.2d 53, 61 (Tenn. Crim. App. 1993). The victim herein was rendered permanently blind by Appellant's actions and left for dead. We agree with the trial court that the victim was treated with exceptional cruelty. Therefore, this issue is without merit.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
DONALD P. HARRIS, SPECIAL JUDGE